In the Matter of the Arbitration between
**FILS ET CABLES D'ACIER DE LENS,**
Petitioner and Cross-Respondent,

and

**MIDLAND METALS CORPORATION,**
Respondent and Cross-Petitioner.

No. 83 Civ. 7073 (WCC).

United States District Court,
S.D. New York.

April 5, 1984.

---

Surrey & Morse, New York City, for petitioner and cross-respondent Fils et Cables D'Acier de Lens; Carl F. Goodman, Barry R. Satine, New York City, of counsel.

Moses & Singer, New York City, for respondent and cross-petitioner Midland Metals Corp.; Arnold A. Jaffe, David B. Picker, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Fils et Cables d'Acier de Lens ("FICAL") has petitioned this Court pursuant to § 9 of the Federal Arbitration Act, 9 U.S.C. § 9, to confirm an arbitration award rendered on September 23, 1983 against respondent Midland Metals Corporation ("Midland"). Midland has cross-petitioned the Court to vacate, or in the alternative to modify, that same award. For the reasons stated below, both motions are granted in part.

I.

The underlying dispute between the parties concerns the quality of certain galvanized wire furnished by FICAL to Midland pursuant to two written contracts, dated June 4 and December 4, 1980. In paragraph 13 of both contracts, the parties agreed to arbitrate their disputes in New York City under the Rules of the American Arbitration Association. The provision embodied in the FICAL/Midland contracts differs from a standard arbitration clause, however, insofar as it specifically sets forth the standard of judicial review to be applied in the event that either party seeks confirmation of an arbitration award. Paragraph 13(c) of both contracts provides:

> The arbitrator shall make findings of fact and shall render an award based thereon and a transcript of the evidence adduced thereat shall, upon request, be made available to either party. Upon an application to the court for an order confirming said award, the court shall have the power to review (1) whether the findings of fact rendered by the arbitrator are, on the entire record of said arbitration proceedings, supported by substantial evidence, and (2) whether as a matter of law based on said findings of fact the award should be affirmed, modified or vacated. Upon such determination, judgment shall be entered in favor of either party consistent therewith.

On September 23, 1983, following proceedings before a panel of three arbitrators designated in accordance with American Arbitration Association Rules, the arbitrators rendered a final award. In that award, the arbitrators made the following factual findings:

A. The material shipped to Taiwan did not meet the Taiwan Customer specifications;

B. The material in other customer hands and in U.S. inventory was not proven to be outside of the specifications; [and]

C. MIDLAND METALS CORPORATION ... had full use of the Taiwan payments.

Pet. Ex. 5 at 1. On the basis of these findings, the arbitrators rendered a monetary award, expressed partially in American dollars and partially in French francs. They directed that Midland pay FICAL: (a) $266,217.30 for Taiwan merchandise; (b) $4,788.97 for merchandise in customer hands; (c) an additional sum of 1,004,503 French francs for merchandise in inventory and in customer hands; and (d) interest of $25,000 plus FF 135,000 plus 11% on FF 834,915 from December 10, 1982 to September 10, 1983. On the other hand, the arbitrators directed that FICAL pay Midland $250,025 for Taiwan settlement and related expenses. The conversion rate determined by the arbitrators to be applicable to these sums was that "in effect 90 days after date of the respective invoices." Pet.Ex. 5 at 1.

While FICAL now seeks to have this award confirmed in all respects, Midland has asked the Court to vacate the award insofar as it grants FICAL damages for merchandise in customer hands and in inventory or, alternatively, to modify that aspect of the award so that it is reflected in American dollars, converted from French francs as of the date of judgment rather than as of the earlier date specified in the arbitrators' award. Midland further seeks to have the interest provisions of the award modified, either to eliminate or reduce the interest awarded in FICAL's favor, or to equalize the award by providing for interest on the sum awarded in its favor. Midland agrees, however, that the Court should confirm the awards relating to Taiwan merchandise in the principal amounts of $266,217.30 to FICAL and $250,025 to Midland.

## II.

■ The threshold question before the Court is whether the parties can, by agreement, alter the nature of a federal court's role in the arbitration process. It is well settled that, in the normal case, judicial review of an arbitration award under the Federal Arbitration Act is quite limited, being confined to determining whether one of the specific grounds enumerated in 9 U.S.C. §§ 10 or 11 for vacating or modifying an award is present. See 9 U.S.C. § 9; Bell Aerospace Co. Div. of Textron v. Local 516, 500 F.2d 921, 923 (2d Cir.1974); Office of Supply, Gov't of Republic of Korea v. New York Navigation Co., 469 F.2d 377, 379 (2d Cir.1972). Otherwise, if the petition is properly before the Court, the Court *must* confirm the award. See 9 U.S.C. § 9.

■ Resort to arbitration is, of course, a creature of contract, see *United Steelworkers of America v. Warrier & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960), favored by Congress and the courts as an alternative to the complications and expense attendant upon ordinary litigation. See *Wilko v. Swan*, 346 U.S. 427, 431–32, 74 S.Ct. 182, 184–85, 98 L.Ed. 168 (1953). In the normal case, the parties, by their contract, bargain for the judgment of the arbitrators, not the court. See *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). Thus, arbitrators ordinarily are not required to explain the reasoning for their award, *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1215 (2d Cir.1972), and their award will not be vacated for a mistaken interpretation of the law. *Id.* at 1214; *Gov't of Korea*, 469 F.2d at 379. As the Court of Appeals for the Second Circuit has explained:

Obviously a requirement that arbitrators explain their reasoning in every case would help to uncover egregious failures to apply the law to an arbitrated dispute. But such a rule would undermine the very purpose of arbitration, which is to provide a relatively quick, efficient and informal means of private dispute settlement. The sacrifice that arbitration entails in terms of legal precision is recognized ... and is implicitly accepted in the initial assumption that certain disputes are arbitrable.

\*     \*     \*     \*     \*     \*

Arbitration may not always be the speedy and economical remedy its admirers claim it is ... [b]ut forcing arbitra-

tors to explain their award even when grounds for it can be gleaned from the record will unjustifiably diminish whatever efficiency the process now achieves. *Sobel,* 469 F.2d at 1214–15 (citations omitted).

■ Although these efficiencies provide the guiding force behind the use of commercial arbitration as a substitute for litigation, it nevertheless remains that arbitration is wholly dependent upon agreement. It is well settled, on one hand, that a party cannot be compelled to submit to arbitration any dispute which he has not agreed to so submit, *see Warrier & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1352, and, on the other hand, that a court is precluded from considering any issue that the parties have voluntarily agreed to arbitrate. *See Mobil Oil v. Local 8–766,* 600 F.2d 322, 326 (1st Cir.1979). From this it follows logically that a party cannot be compelled to submit his dispute to arbitration under rules to which he has not assented.

Here the arbitration clause contained at ¶ 13 of the parties' contracts alters the roles of the arbitrators and the courts from those normally obtaining where the parties bargain for resort to arbitration; Paragraph 13(c) affords less weight to the decision of the arbitrator and provides for more extensive court involvement than is ordinarily the case. However, since resort to arbitration is by itself a product of contract, there appears no reason, absent a jurisdictional or public policy barrier, why the parties cannot agree to alter the standard roles.

■ Even though federal courts are courts of limited jurisdiction, the Federal Arbitration Act does not itself preclude this agreed grant of greater power to the reviewing court because the review provided by the Act is not independently jurisdictional in nature. Before one can seek to confirm an arbitration award in federal court, federal subject matter jurisdiction must exist independently of 9 U.S.C. § 9. *See General Atomic Co. v. United Nuclear Corp.,* 655 F.2d 968, 969 (9th Cir.1981). Here, federal jurisdiction exists by virtue of the constitutional and statutory grant of diversity jurisdiction. See 28 U.S.C. § 1332(b).

Moreover, there exists no public policy impediment to the procedure agreed upon by the parties. Although the process contemplated by ¶ 13 of the contracts admittedly takes away much of the efficiency incentive for resort to arbitration, it nevertheless reduces the burden on the Court below that which would exist in the absence of any provision for arbitration. Whereas in an ordinary commercial litigation the Court would be required to decide all aspects of the dispute, here the Court is being asked only to review the arbitrators' findings for substantial evidence and legal validity. This is clearly a far less searching and time-consuming inquiry than a full trial.

■ In any event, if public policy forbade, as petitioner contends, application of the standard of review called for in the parties' contracts, then the entire arbitration provision of these contracts could not be enforced. The parties did not agree to arbitrate their disputes in the customary sense; rather they agreed to a process by which a nonjudicial body would make a determination, which would then be subject to substantial judicial review. As noted above, one can only be compelled to arbitrate that which he has agreed to arbitrate. Here, absent the judicial review provision, the parties to this action did not agree to arbitrate their disputes. Accordingly, for these reasons, I will review the arbitrators' award in this case in accordance with the standard provided for by the parties' agreement and not by the less searching inquiry normally applicable in an action to confirm an arbitration award.

### III.

The substantial evidence standard of review provided for in the parties' contracts is not unknown to this Court. Indeed, the standard is identical to that employed by the Court when reviewing an agency determination under the Social Security Act,

which this Court is required to do on a very frequent basis.

Under this standard, the arbitrators' factual findings shall be conclusive and will not be second-guessed by the Court so long as they are supported by substantial evidence. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

The first finding to which Midland objects is the arbitrators' conclusion that the wire in customer hands and in U.S. inventory was not proven to be outside of the contract specifications. Although I might not have reached the same conclusion had I been sitting as the trier of fact, a reasonable mind could certainly have so concluded.

Midland itself plainly admits that the results of several tests conducted on FICAL wire were contradictory. *See* Respondents Main Memo at 31. While it is true that three tests found FICAL wire to be defective while only one concluded that it conformed to ASTM standards, a straight comparison of the absolute numbers of favorable and unfavorable outcomes cannot be applied mechanically to compel a finding that the wire delivered by FICAL was nonconforming. The arbitrators surely had discretion to appraise the quality and reliability of the respective tests in making their determination. Thus, they were within their powers to reject some test results altogether or to afford them less weight than others because of the manner in which the tests were conducted or the expertise of the testers.

Here there was, for instance, evidence that City Testing and Research Laboratories, which had performed tests favorable to Midland's position that the FICAL wire was non-conforming, had not performed a single test during the past two or three years for any client except Midland. *See* tr. at 169–70. On the basis of this testimony alone I could not reverse the arbitrators if they decided that the City Testing findings were not credible. The point is that the process of weighing conflicting evidence is by nature a subjective inquiry. Because Midland bargained to have the arbitrators, and not the Court, render factual findings in this case, it cannot now be heard to complain because those findings turned out to be adverse to Midland's position.

So long as the arbitrators' conclusions are within the realm of reasonableness, they will not be set aside by this Court, even under the standard of review contracted for by Midland and FICAL. I cannot in good conscience conclude that the arbitrators' finding that the material in customer hands and in U.S. inventory was not proven to be outside of specifications is so unreasonable or lacking in substantial evidentiary support that it should be overturned. The base award in favor of FICAL for merchandise in inventory and in customer hands will, therefore, be allowed to stand.

I find, however, that the arbitrators went beyond the parties' agreement and erred as a matter of law in finding that the conversion rate applicable to the award in favor of FICAL for merchandise in inventory and in customer hands, which was expressed in French francs, is that in effect 90 days after the date of the invoice. Under the parties' contracts, FICAL agreed to deliver the wire F.O.B. in either Antwerp or LeHavre, not the United States. Moreover, under the December 4, 1980 contract, the prices which Midland agreed to pay for the wire were expressed in French francs, not American dollars. Under these circumstances, it is appropriate to convert the recovery awarded in French francs into American dollars as of the date this Court's judgment is entered. *See Shaw, Savill, Albion & Co., Ltd. v. The Fredericksburg*, 189 F.2d 952, 955 (2d Cir.1951), *quoting* 5 Williston on Contracts at 3929–30 (Rev. ed.)

(where obligation is performable in foreign country, the judgment day rule is applicable, on ground that an obligation in terms of currency of that country involves risk of currency fluctuation); *see also Deutsche Bank Filiale Nurnberg v. Humphrey,* 272 U.S. 517, 519, 47 S.Ct. 166, 166, 71 L.Ed. 383 (1926) (obligation in terms of currency of a country assumes risk of currency fluctuations); Restatement (Second) of Conflict of Laws § 144 (1971).

As explained in a comment to the Restatement, the rationale for the date-of-judgment rule lies in the fact that an American court can only render a judgment expressed in American dollars. Restatement (Second) of Conflict of Laws § 144 comment b (1971); *see Shaw, Savill, Albion & Co.,* 189 F.2d at 954 ("It is well settled that a money judgment by an American court must be in American currency."). However, because the underlying obligation was expressed in a foreign currency and was payable in a foreign country, the risk of currency fluctuations should remain on the one entitled to payment in the foreign currency. *See id.* This objective is most closely approached by applying the conversion rate as of the date of the United States judgment.

Moreover, it is clear from the transcript of the arbitration proceedings that FICAL understood that it expressly undertook the risk of currency fluctuations in contracts calling for payment in American dollars, while Midland was exposed to a similar risk in contracts calling for payment in French francs. Indeed, at the arbitration FICAL's attorney persuasively argued against conversion as of the date of breach.

THE CHAIRMAN: Can we take today's rate for conversion.

[FICAL's ATTORNEY]: No. I think it has to be the rate in effect at the time payment is ultimately made. If an invoice in a contract is entered in a foreign currency, and if the company accepts that contract in the foreign currency, the risk of exchange is on them. We have entered into certain dollar contracts, so we are taking the risk of exchange.

They have entered into certain French franc contracts. They have taken the risks of the exchange. I don't see any purpose of converting the dollars into francs or the francs into dollars at this time.

THE CHAIRMAN: Suppose I want to give the award today. Do you think I will give the award in francs as well as in dollars?

[FICAL's ATTORNEY]: I think you would give it in the currency in which the invoice has been written. As to the dollars, they would transfer the dollars, and we would convert them into francs. And as to the francs, they would go to their bank and convert to dollars.

Tr. at 64–65.

Unfortunately, because this Court is empowered to award a money judgment expressed only in American dollars, it is impossible to realize fully the parties' contractual expectations, as FICAL itself clearly explained at the arbitration hearing. The next best approximation, however, is application of the date-of-judgment rule to the amounts expressed in French francs. Consequently, I reject FICAL's attempt, with the advantage of 20/20 hindsight concerning the trend in currency exchange rates, to reverse its prior position in an effort to support an element of the arbitration award so clearly contrary to the parties' contractually expressed intent. Accordingly, the award will be modified to provide for conversion of amounts expressed in French francs as of the date of this Court's judgment.

■ The final matter concerns the arbitrators' award of interest in favor of FICAL without a corresponding award on the sums they found to be due Midland. Unfortunately, the arbitrators failed to make any factual findings to justify this action as they were required to do by the terms of the parties' arbitration agreement, nor did they endeavor to explain how they arrived at this asymmetrical and unusual award of interest. On the current state of the arbitration award, I am unable to determine whether the arbitrators' award of interest

in this manner is supported by substantial evidence, is properly calculated, or has any basis in law. Accordingly, the award of interest to FICAL set forth in ¶ 1(d) of the award cannot be confirmed at this time in accordance with the standard of review which the parties have contracted for me to apply. Rather, this matter will be remanded to the arbitrators to explain the factual and/or legal basis for the seemingly anomalous award of interest, as they were required by the terms of the parties' arbitration agreement before this Court can properly review the award.

### IV.

For the reasons stated above, the arbitration award is confirmed insofar as it awards FICAL: (1) $266,217.30 for Taiwan merchandise; (2) $4,788.97 for merchandise in customer hands; and (3) FF 1,004,503 for merchandise in inventory and customer hands. The award of $250,025 to Midland for Taiwan settlement and related expenses is similarly confirmed. The award is modified, however, to provide that insofar as it awards FICAL the sum of FF 1,004,503, that figure will be converted into American dollars in the judgment at the commercial rate prevailing in New York at the close of business on the date of this Opinion and Order. Finally, this matter will be remanded to the arbitrators for further findings and conclusions relative to their award of interest in favor of FICAL.

FICAL is directed to submit a proposed judgment in accordance with this Opinion and Order within five days on five days' notice.

SO ORDERED.